Judge Bírch
dissenting*
Municipal Corporations having beeii ulmbSt cotemporary with the earliest institution of political sovereignty, no sufficient reason is perceived why the rule applicable to iheir transactions should not have been moulded into cotemporary consonahce with the radically opposite and progressive systems of government, which} amongst us, are held even farther to have overshadowed the advances of freedom once marked by them, than those advances were renowned and cherished for having supplanted in their early day} the assumed prerogatives of princes and the odious exactions of the feudal systeffi* Being but *425 “sovereignties within a sovereignty,” the idea would seem, even at first perception too implausible to be entertained, that in this State, at least, they are either more or less than the constitution and the laws of their creation expreSsly permit them to be ; and as it is the master maxim of the noble science we afe called to ádmihister, thát “ rules cease with the reaso?i’s which gave them being” the mind need pause but littlé to scan either the conflicting definitions of English commentators, or the doctrines of English judges, when seeking to ascertain either the nature of the duties of such institutions originating here. Being, moreover, without the means of accurately comparing with our •own the statutory enactments of the older Atlantic states, the deference which is usu&lly rendered to the decisions of their courtá, may be at least respectfully waived in the consideration of the case before us. It may bé, that the legislatures of those states (like the British parliament) háve felt themselves indued with an “ omnipotence” so far transcending the constitutional authority of ours, as to justify them in investing the corporations bf th'eir creation with the exemptions asserted for them by their judicial tribunals. With us, however, the case is conceived to be not only radically different, but too plain and unambiguous to require, in the elucidation of the point in issue, any other authority than the guaranty of the constitution, to which the act incorporating the city seems to have been strictly and intelligently conformed.
By the 7th sub-division of the 13th article, it is declared that “courts bf justice ought to be open to every person, and certain remedy Afforded for every injury;” and, whilst it may be admitted that the language is but declaratory, it is nevertheless maintained, that, consistently with its sworn duty, the legiéíatuf e could not have authorized an “ injury” to be done, either directly or indirectly, in such a manner as to exclude the injured citizen from “certain remedy ?” Nor has it done so. The law incorporating the inhabitants of the city not only does not exempt, but expressly subjects them to be “sued,” and to “defend” themselves just as an individual or “ natural person;” and as it will not be pretended that for such an injury as the one complained of, one citizen would not be liable to the suit of another, it is respectfully submitted that the legal stature of this corporation, in respect to the immunity which is 'claimed for it, is as definitely fixed as that of the humblest or the proudest man within its limits, and that the act complained of, can have no analogy to the c'ommon láw exemptions, “ damnum absque injuria.”
If we descend, br rather ascend, from what is deemed to be the lavó *426 in this case to the reason of it, it will be deducible from such reflection as commences at the right point, that the constitutional declaration which is relied upon as a guaranty here, was but the proper recognition of a great and all-embracing political truth which had been long dawning upon mankind, and which (when permitted) should be no less respected in their courts than in other departments of their government. It is that “ upon no just principle do we commence the exercise of public power, for the general benefit, except at the point where experience or reflection may have demonstrated or suggested that ordinary private regulations are inadequately adapted to the necessary end—and it follows, as a consequence, that the public power thus invoked and moulded into action, can only be exercised for the public benefit, by the public agents, at the public expense.” All beyond or below this is public usurpation, or unmitigated public aggression—and the latter, in this case, seems too glaring and fundamental to be sanctified even by a judicial misapplication of the maxim which has been translated from our shield, to vindicate here the public right to commit, and unredress, a public wrong !
As to the impolicy, therefore, of subjecting corporations to suits of this character, if it were even an open judicial question, no sufficient reason occurred why a citizen who may sue his neighbor, should be restrained from similarly suing 6 or 7,000 (incorporated) for an injury which, as was proven in this case, despoiled him in contempt of his most earnest and admonitory protest, of atleast half the value of his property in a manner so unqualified and absolute, as to be redressed by a jury the vicinage, with all the facts before them, in a verdict of $1,675. That suits for smaller injuries might be brought by others, is conceived to be no more a reason for denying the right in respect to a corporation than as between individuals, and unless words have strangely lost their meaning, the constitutional injunction would seem to be as inoperative in the one case as in the other—leaving to the every day discretion and prudence of the injured party, whether for damages comparatively slight, he will incur the trouble and expense of asserting his rights.
From these premises, predicated upon our own system of constitutional [guaranties and just government, it may be readily admitted, without at all impairing the reasoning applicable here, that all the more ancient doctrines and “ authorities” (?) sustain amply and even redundantly the conclusions arrived at by the seinor members of this court. It is relied, however, on the other hand, that the more enlightened adjudications of later years, had been gradually adopting principles more *427 congenial to the policy of our governments, and the changed condition of the age in which we live, until it may be proudly heralded, that in one of the states at least, American jurisprudence has nobly disentangled itself from the iflnex labyrinths of English precedents, and the great moral and political truth, that “ corporations like individuals should be liable in a suit for consequential damages, caused by a lawful act,” has been enstamped with the wonted dignity of a legal principle. Rhodes vs. the city of Cleveland, 10 Ohio 159. In reasoning to this conclusion, the eminent chief justice who declivered the opinion of the court remarked, that he did not look so much for precedents, as to the following out of ineontestible principles ; and as the opinion in that case, and in a previous one before the same tribunal, constitute the principal official concurrence which can be referred to in support of this dissent, the language and conclusions of those judges, in lien of the inferior originality of a less practised and more diffident judicial pen, will be interwoven, and as far as practicable adopted in conclusion here.
It did not appear to the court there, to be a sufficient reason against sustaining such a verdict as this, that in other states the remedy against corporations had not been carried so far. So long as it was kept apparent to a cool and enlightened investigation, that they did not transcend the line to which they were conducted by acknowledged principles, the mere fact that they might be going farther than adjudged cases had gone before, occasioned them no disquiet. It was in fact their duty to add the weight of precedent to the scale of right—and had they faltered, under such impressions as they seem to have entertained, no epithet would have been too severe to have applied to so great a derelection, as having foregone the convictions of a deliberate judgment to the mere numerical preponderance of previous decisions. It was admitted then, as now, that in the elder cases, whilst courts were hampered by the notion that corporate acts were to be performed under the authority of their seals, no suit like the present could be entertained. The agents, only, were regarded as responsible to persons injured. It was argued, however, with conclusive force, that since the great increase of corporations, and since so much of the business of the world is transacted through their agency, it becomes necessary that courts should meet their expanding poioers by an extension of the limits of their liability; and that one of the peculiar benefits which our system of jurisprudence possesses, is its capacity of enlargement and adaptation to the exigencies of the varying forms of social life.
££ That the rights of one should be so used as not to impair the rights *428 of another, is a principle of morals which, from very remote ages has been recognized as a maxim of law. If an. individnal, exercising his lawful powers, commit an injury, the action on the case is the familiar remedy : If a corporation, acting within the scope of its authority, should work wrong to another, the same principle of ethics demands of them to repair it, and no reason occurs to the court why the same remedy should not be applied to compel justice from them.”
Whilst the reasoning in the Ohio case, just quoted, is deemed; to be irrefutable, and should consequently dispose of this case, there remains ^mother, and perhaps to many minds, even a plainer view to be taken of it. In the conclusion of the constitutional sub-division already referred to, it is declared “ that no private property ought to he taken or applied to public use without just compensation”—and it will not be pretended that the legislature co.uld authorize to be done, by a cowardly indirection, what the permanent will of the State had decreed, and written down in its constitution, ought not to be done in any spanner. In the case of Hooker vs. a canal company, the supreme court of' Connecticut held (note in U. S. Digest, vol. 1 p. 401) that ££ an injury to land which deprived the owner of the ordinary .us.e of it, is equivalent to a ££ taking” of the land ; and whpreno compensation is provided for, pr made to the owner for the injury sustained, he is entitled to recover damages for such injury.” In the case now under consideration, the testimony was plain, abundant and unequivocal, that in consequence of' the manner of paving the streets, and of the, insufficiency of the sewer, the water and filth of that part of the city was, thrown upon and into the lower story of the plaintiff’s house—sometimes rising even into the rooms of the second floor—undermining, sinking and throwing down portions of the foundation, cracking the walls and (altogether) rendering the property comparatively uninhabitable and valueless. The Connecticut case, which simply ££ deprived the owner of the ordinary use of his property”* could scarcely have been stronger than this; and if the judge of the court of' common pleas had given to the jury an additional instruction, in the words of that decision, it is imperceivable how, upon the principles of common sense or common justice (the only true foundations of common law) it could have been objected to as erroneous. 4s little could it.be objected to, if, in our courts, as in others, 9 Dana 114; 14 Ohio 147, 541; 5 Blackf’d 384, any benefit confered upon property thus injured or “ taken,” was allowed to be equitably set off’ against the damage complained of. Even in this case, the main Ipody of the testimony touching the measure of damages, seems to have. *429 liad specific relation to the comparative value of the property before and after the city improvements which caused the injury ; and the instructions of the court, when applied to the evidence, could have left to the jury no improper discretion as to any other measure of assessment. That instruction, was in these words :
“ If the jury believe, from the evidence, that the plaintiff was the owner, of the premises, in the declaration mentioned, and that the city of St. Louis (the defendant) in the improvements they made upon the streets and alleys, leading to and by the premises of the plaintiff, caused water, mud and filth to flow by and along the premises of the plaintiff,, and that the. works so constructed to carry off said water, filth and mud, was not of sufficient capacity and size to carry off the said water,, mud and filth as aforesaid, and that the same was thrown upon the premises of' the plaintiff, and overflowed his cellar and buildings, and that the plaintiff sustained damage to his house and lot, they will find the defendant guilty, and assess such damages as the said plaintiff has, proven he has sustained.
That this, is substantially the rule which ought to be applied in cases like the present, and that it would in no just sense impair the necessary-efficiency of city corporations, may be restated in. the recapitulation, which will close this paper.
1. The public alone, who judge of the necessity, and who enjoy the-convenience and reap the benefit of public improvements, should bear-whatever damage is thereby occasioned to pre-existing private rights. If, therefore, this case were referable, even in a greater degree than, has been supposed, to thq jurisprudence of other states and countries, the deference ordinarily paid to the opinions of those who have merely written before us, should ever be subordinate to the conviction, that as the judicial edifice which they have been rearing is but the work of finite and discordant minds, it becomes the duty of each tribunal, in its turn, to contribute to the symetry and perfection of its proportions, by no less firmly resisting and modifying such rules as are clearly erroneous, than by respecting and conforming to those which are hallowed by reason as well as by time.
2. As a judicial decision upon such a subject as this, however, should be based somewhat upon the political science of the country where it is rendered, and as with us, the constitution records that science, we should construe, if possible, as in unison with the spirit of that instru_ ment, all subsequent emanations.' of the. legislative will; and, as the act of 1843 contains nothing, even, by rational implication, to exempt the *430 corporators from the ordinary liabilities of an individual, hut on the contrary expressly renders them liable just as “ a natural person” would have been, the verdict of the jury who simply found the fact, and assessed the damages, under proper instructions from the court, should not be disturbed for any reasons upon the face of the record here.
These considerations, which might be greatly amplified and extended, have restrained a reluctant diseoncurrence both with the ethics and the law, which, having driven a citizen from his home now drives him from the halls of justice with the abasing humiliation confirmed to him in the shape of a judicial decision, that if the authorities of his great and growing city, to the treasury of which he renders his yearly proportion, see fit to employ the aggregate taxes thus accumulated, to empty upon him, instead of carry to the river, the wash and offal of all the neighboring streets and alleys, the saving to the city renders it an “ injury” of that class, for which the policy of the law allows him no “ remedy /”
Such a citizen (it is as respectfully as earnestly submitted) is but tantalized when told, that “ under certain circumstances” if he can establish that the corporation acted “maliciously,” ho can make them pay. That question was not in issue, and perhaps will never be, under the advice of any lawyer, who appreciates intelligently the difficulty of technically sustaining such an allegation. So long, therefore, as the city is subject alone to a rule like that, its corporation will be comparatively omnipotent, its inhabitants, by turns, oppressors and vassals.